# West Chester & Philadelphia Railroad Company et al., Appts., v. Kingston Goddard et Ux.

Where a railroad company having by its charter power to take land for a double track, if it desires, builds a single-track line through lands, and takes a release which contains no description and puts upon the owner of the land the duty to build and maintain the fences, and he builds the fences immediately and maintains them for a long term of years, a presumption arises that the right of way is limited to the strip of land so fenced.

Unless this presumption is rebutted the railroad cannot encroach beyond the fences, for the purpose of building an additional track, without making or securing compensation to the owner.

Cited in Kelly v. Philadelphia & R. R. Co. 5 Montg. Co. L. Rep. 29, 30; Chestnut Hill, etc., Turnp. Co. v. Pennsylvania R. Co. 6 Montg Co. L. Rep. 121, 123; Commonwealth Title Ins. & T. Co. v. Willow Grove & G. Pl. Road Co. 17 Montg. Co. L. Rep. 76, 83.

NOTE.—The presumption is that the railroad company, which appropriates land, has taken to the full width of its right of way. Jones v. Erie & W. V. R. Co. 144 Pa. 629, 23 Atl. 251; Wilkinson v. Philadelphia & R. R. Co. 13 Montg. Co. L. Rep. 93. But when the road is finally constructed, and fences are erected, this is evidence of the amount taken. Philadelphia & R. R. Co. v. Obert, 109 Pa. 193, 1 Atl. 398; Mt. Pleasant Coal Co. v. Delaware, L. & W. R. Co. 200 Pa. 434, 50 Atl. 251. But disconnected portions of fence, erected to keep cattle from the tracks, is not sufficient to overcome the presumption that the railroad took to its full width. Fisher v. Pennsylvania Co. 1 Sad. Rep. 387.

Mere proof that, soon after the road was built, the president reported to the stockholders that a right of way for a double track had been secured for the whole line, will not rebut the presumption.

(Argued February 6, 1888.   Decided March 19, 1888.)

January Term, 1886, No. 425, E. D., before GORDON, Ch. J., PAXSON, STERRETT, GREEN, CLARK, and WILLIAMS, JJ. Appeal from a decree of the Common Pleas of Delaware County granting a perpetual injunction. Affirmed.

This was a bill in equity, filed by Kingston Goddard and Helen, his wife, against the West Chester & Philadelphia Railroad Company and the Philadelphia, Wilmington, & Baltimore Railroad Company for an injunction to restrain the defendants from entering on the plaintiffs' lands.

E. A. PRICE, Esq., the master, reported as follows:

Mrs. Helen Goddard, one of the plaintiffs, is the owner in fee of a certain messuage and tract of land in the township of Springfield, Delaware county, containing about 8 acres, 3 roods and 6.39 perches, which she derived by deed from Elijah Jones and wife, dated April 20, 1878, and recorded in the office of the recorder of deeds for Delaware county, in Deed Book N, No. 4, p. 641.

These premises were part of a tract of 45 acres, of which one William C. Longstreth became seised in fee in the year 1843, and held until the year 1857, and which came down to the said Elijah Jones by a regular chain of conveyances from the said Longstreth.

The West Chester & Philadelphia Railroad Company, named as one of the defendants, was incorporated under the provisions of two acts of assembly, one approved April 11, 1848 (P. L. of 1850, p. 916),and the other approved April 15, 1850 (P. L. p. 407).

On May 6, 1852, the said William C. Longstreth in consideration of the sum of $400, which was afterward paid, executed to the railroad company a grant of a right of way, through, over, and upon his land to such an extent as might be necessary for the construction, opening, and use of the road, and a release of all further claim for compensation for any damages that might accrue to the land and appurtenances or any part thereof, by

reason of the locating and construction of the railroad through and upon the same, giving and granting to said company the right to occupy for the said railroad such and so much of the said land as might be required for the same—the said Long-streth agreeing for himself, his heirs and assigns, to provide and set up a good and sufficient fence on both sides of the road through the land, and to keep the same in repair, which grant and release is set out in full as Exhibit A in the answer of defendant.

No width is mentioned in the grant and release, nor was it ever put on record.

On April 10, 1850, ground was broken in the construction of defendant's road, and a single track was located and constructed under the superintendence of T. E. Sickles, over and through that part of the land of the said Longstreth now held and owned by Helen Goddard, all of which lies on the south side of the road.

It seems to have been the intention of the railroad officers at the time of the location to secure ground of sufficient width for a double-track road, and the president and engineer in their third annual report made to the company, on January 10, 1853, state that a width of 25 feet at grade with the requisite side slopes at excavations and embankments had been obtained.

There were no visible marks set anywhere to show what lands the company intended to occupy, except in cases where juries were called out to assess damages; and then stakes were set to show what lands were taken.

Consequently there was nothing placed on the lands now owned by Mrs. Goddard to indicate the extent of the defendant's location, right, or claim under its powers, except the single track referred to, which has never been changed from its first location and through the lands of the plaintiffs; no additional track has ever been constructed on the south side of the original one.

Under the covenant and agreement of his grant Longstreth erected a post and rail fence on the south side of the road the whole length of plaintiffs' property, immediately after the road was finished. This fence was in a straight line, and at the place where the bed of the road was above grade it was close to the foot of the embankment.

Up to the time of the Goddard purchase, this fence had been maintained with some changes in character by Longstreth and his successors in title in exactly the same place as originally

located, save at the west end, where for a short distance east from the now Kedron avenue, along where the railroad is at grade, Sketchley Morton, a former owner, had set the fence bordering his lawn back from the railroad 10 or 12 feet, for the purpose of making a roadway to his stable at the easterly end of his lawn, which after being used several years was abandoned; and the fence was set out at this point to within a foot or two of its old position by his son, which position it continued to occupy until Mrs. Goddard purchased. This part of the fence had been changed by Morton to one of pickets, and Mrs. Goddard replaced it with one of iron.

The rest of the fence had been changed by Morton to one of boards, and this she replaced with one of wire. These new fences were set a foot or two back from the line of the older fences to prevent material falling from defendant's cars from coming on to plaintiffs' land, and have not since been changed in location.

After the location of the railroad, Mr. Sickles, the engineer, says he had a map prepared, showing the amount of land taken everywhere between West Chester and Philadelphia, and showing a width of at least 25 feet at grade, and in excavations and embankments 1½ feet horizontal to 1 foot vertical, with 2½ feet additional on each side for fencing; all of which he says was to provide the necessary width for a double track, and for side slopes in excavation and embankments. Along the premises in question he says the additional track was to be on the south side of the present track, which was built on the north side.

Two copies of this map were made, one a pocket map for Mr. Rutter, the then president of the company, and the other for the office, at which place he left it. This map was not produced before the master, nor was Mr. Rutter called as a witness. Prior to the year 1861, and during the presidency of Marshall B. Hickman, Mr. Sickles says he walked over the road once with an assistant engineer, and made some notes or memoranda in relation to the width taken for a double track, which he fixed at 25 feet at grade, with 2½ feet each side for fences, the result of which examination is contained in paper marked "N. Y." and attached to the testimony.

On August 11, 1873, the managers of the company at a stated meeting authorized the committee on road to employ, at their discretion, an engineer to locate the line of the road.

At a stated meeting of the managers, held on June 8, 1874,

the superintendent, under the direction of the president, was authorized to purchase stones to mark the right of way of the company and have them set as speedily as possible. By virtue of this authority an engineer by the name of Arnold Syberg, an assistant of Mr. Sickles, the original engineer, was employed, who reran the lines of the road and prepared a map of his work, which was marked "Map of the West Chester & Philadelphia Railroad, showing the different properties through which the same passes; also the cuts and embankments, scale 400 feet one inch, resurveyed October, 1873, February, 1874, by Arnold Syberg, C. E.," and filed in the office of the company, a section of which marked "D" is attached to the testimony; and granite stones 2½ feet long, and about 4½ inches square were purchased and placed at the corner of each property along the line of the railroad.

At a stated meeting of the managers of the said company, held on July 19, 1875, "the committee on road reported specially that in pursuance of a resolution of the board, passed April 11, 1873, an engineer had been employed, Arnold Syberg, who had made a complete survey of the road, as originally located, and filed his report, with maps and plans of the same, in the office of the company in February, 1874, and that the committee had since caused stones to be set in accordance therewith, except at Henry Townsend's property, near Cheyneys, and Bernard Riley's at West Chester, which remain to be adjusted," which report was accepted and filed. Two of these stones were placed on the land now owned by the plaintiff—one at the west end near Kedron avenue, and the other at the east end at the Amosland road. At the west end the stone was set about 2 feet nearer the track than where the picket fence was afterwards placed. It was put apparently in the line of the old post and rail fence, about in the line of the telegraph poles used by the Western Union and the railroad company, and now stands 3 feet out from the iron fence which took the place of the pickets.

At the east end the stone would appear to have been set about 2 feet farther away from the track than the board fence was, as the stone is now exactly in the line of the wire fence which was set 2 feet farther into the field than the board fence stood.

Similar stones were placed on the north side of the track opposite the two on the south side. The distance between the two at the west end of Mrs. Goddard's line is about 33 feet; the dis-

tance between the two at the east end of line has not been given. Pending negotiations for the land, Dr. Goddard visited the premises in the interest of his wife and observed the fences; but he is not clear as to whether he then observed the stones. There was nothing on the ground or on record to call his attention to any rights of the railroad company beyond what it was then enjoying; and no notice of any such rights was ever given to himself or wife in any way, nor to any predecessor in title, so far as shown.

The railroad company now proposes to lay an additional track through the land, south of the existing track, and for this purpose is taking a strip of ground about 600 feet in length, 12 2-10 feet at its greatest width, and of an average width of 6 3-10 feet on the Goddard side of the road, all of which lies south of Mrs. Goddard's present fence, as shown on plot prepared and exhibited by Mr. Lodge, the superintendent of the road, marked "G" and attached to the testimony. This ground is necessary to enable the company to construct a double track, which for a road of ordinary gauge requires 31 feet 3 inches in width at grade.

The width of the road proposed does not at any point exceed 60 feet from the bottom of north slope to the bottom of south slope, and involves filling, and the making of an embankment of 8 feet, at its highest point, the bank of which, according to the general rule, should be 1½ feet horizontal, to 1 foot vertical. It is to prevent the construction of the additional track as proposed, through and over the lands of Mrs. Goddard, without the damages therefor being first assessed and paid, or sufficient security given for the same, that the present bill has been filed.

The defendant sets up that in laying the additional track, it is simply exercising its lawful right so to do, under and by virtue of the agreement with William C. Longstreth, made at the time the road was constructed through his land; that the agreement gave the company sufficient land for a double track, and that it was at that time so located, determined, and designated by the company's engineer.

Such being the facts, the issue between the parties is limited to a very narrow one, and is all involved in the single question: What land did the company take at the time of the original location of the road? If it then located and took 60 feet or more in width or sufficient land for a double track, it can claim

it now. Its rights were then fixed and no power could abridge them.

Having been declared a public highway by the 18th section of the general railroad act of February 10, 1849, its rights could not be encroached upon by any adverse holding, as in Pennsylvania the statute will not run against the public.

For the same reason it is beyond the power of the company to dispose of any of its franchises in any way, and thus limit the public in the use of any rights it had once acquired.

This being the case, the rules of law as to adverse holding, notice of easement and the protection of the recording acts, which were invoked by the plaintiffs and which would apply as between individuals, or between an individual and ordinary corporations, are not applicable here.

If they were, the case would be with the plaintiffs on all these points. The defendant's rights being therefore protected from infringement, it is only necessary to ascertain what those rights are, and this depends on the question before stated, what land did the company take in the original location?

The plaintiffs claim that it took no land beyond the present fence on the south side of road, while the defendant claims that it took a strip 60 feet in width, which would extend beyond the fence. The Longstreth grant is indefinite as to width, and in this respect throws no light on the question.

Its solution can only be had by an inquiry into the acts of the railroad company, and those of the successive owners of the land from Longstreth down.

Let us first look at the powers of the company in respect to the taking of land for its purposes. By § 11 of the act of April 11, 1848, the president and managers of the company had the power to survey, lay down, ascertain, make, and fix such route as they deemed expedient for their road, with as many tracks as they deemed necessary.

By § 10 of the general railroad law of February 10, 1849, companies were given the power to take such land as the president and directors might deem expedient, not exceeding 60 feet in width, except in the neighborhood of deep cuttings or high embankments, etc.

By the Longstreth grant in 1852, the company had the right to take as much land as might be necessary for the construction, opening, and use of said road.

The act of 1849 did not certainly repeal that part of the act of 1848 which permitted this company to take land without restriction; but if it did, the Longstreth grant revived its powers, and the effect as to the company was the same as though there had been no repeal. It is doubtful, however, whether § 10 of the act of 1849 applies to this company. A reading of the act shows that some of the sections apply to companies incorporated before its passage, and some to companies incorporated afterward. Section 10 would seem to apply only to those incorporated afterward, and if so, all question as to the act of 1848 is removed.

We find, therefore, that both under the act of 1848 and under the Longstreth grant, the company had the power to take as much land as was deemed necessary for its purposes, without restriction except as to its necessities. The defendants invoke the act of 1849 in their behalf, and claim that because it gave them the power to take land up to 60 feet in width, and because it was in existence at the time the road was commenced, the presumptions are that the full 60 feet was taken.

If, as before stated, that part of the act of 1849 did not apply to this company, it will be readily granted that no such presumption could arise.

Assuming, however, that the act did apply, and that the presumption is that 60 feet in width was taken, it would not be conclusive of the fact, for such presumption may be removed by evidence of actual possession taken of less ground. Pennsylvania Canal Co. v. Harris, 101 Pa. 93.

While it is true that the company had power under the act of 1848 to take such land as it needed, yet it does not follow that the title to such as was taken was grounded upon the act of assembly. Had the company entered and appropriated the land under the law, and then obtained a release of damages therefor, its title would have been grounded as stated; but it did not. It purchased the right of way of Mr. Longstreth for a consideration; and in his grant he further released the company from any damages to his other land outside of the right of way by reason of the surveying, locating, or constructing of the road. Whatever rights then the company had or exercised were grounded upon the Longstreth grant.

The power of location which the company thus had, whether under the law or under the grant, belonged to it exclusively. It

was a right which it was bound to exercise in the beginning, so that its claims might be fixed; and the exercise of this right was a binding expression of its needs and an exhaustion of its powers.

In making this location, the company was not confined to the present needs of its business, but might properly provide for the future requirements of a more extensive traffic. What it needed, however, in the future, was in the first instance to be designated, fixed, and determined. See New York & E. R. Co. v. Young, 33 Pa. 182; Wirth v. Philadelphia City Pass. R. Co. 2 W. N. C. 650; Kraut's Appeal, 71 Pa. 64; Lodge v. Philadelphia, W. & B. R. Co. 8 Phila. 345.

In the exercise of its powers, the company entered upon the land of Mr. Longstreth. No sketch, plot, or record of the land proposed to be taken was made; and no marks were put upon the ground, except a roadbed over which,—extending to Philadelphia on one side, and to West Chester on the other,—was laid a single track; and immediately thereafter Mr. Longstreth, who owned on both sides, erected a post and rail fence along the whole line through his property in pursuance of his agreement; that on the Goddard side being close up to the foot of the embankment, at the place where the road was above grade. In the absence of marks to show that the company had located a road wider than that inclosed between the fences, or of any evidence of a larger right or claim, there is nothing to show that the fence thus set up was not acquiesced in by both parties, as marking the land which the company had taken and located under its powers, and if so, every post became a landmark between them. Allen v. Mayer, 1 Del. Co. Rep. 49.

During the occupancy of Sketchley Morton, he made a material change in the character of the fences, consisting of the entire removal of the posts and rails, and erecting in their stead, from the east end, along the disputed territory, a board fence, and for the rest of the distance westward, a picket fence. No objection appears to have been made to this change by the company, and its silence may be accepted as another evidence that the fences were considered to inclose all that the company had in the first instance taken, or to which it had any claim or right. The next step was one taken by the company, while the Goddard property was still in the ownership and possession of Sketchley Morton.

It was done by the company, of its own motion, without the

knowledge of, or consultation with, those who were likely to be affected, and was in its nature, both active and aggressive.

This step was the relocation of the line of the road, and the setting of stones to mark the right of way. Its purposes are fully set out. It was ordered and confirmed by the proper authority, and admits of but one conclusion, and that is that it was for the purpose of ascertaining and marking, by enduring monuments, the land which the company had originally taken for its purposes.

The first action on August 11, 1873, was an authorization of the relocation of the line of the road, which was done by Mr. Syberg, who reran the line in October, 1873, and February, 1874.

Then came, on June 8, 1874, a direction to the superintendent to purchase stones to mark the right of way of the company, and to have them set as speedily as possible, following which, on July 19, 1875, came the report of the committee on road, stating that, in pursuance of the resolution of April 11, 1873, Mr. Syberg, an engineer, had made a complete survey of the road, as originally located, and that the committee had since caused stones to be set, in accordance therewith, which report was accepted, the stones on the Goddard property having been set as before found. Where Mr. Syberg procured his *data* from which he reran the lines does not appear. He does not seem to have followed the memoranda made by Mr. Sickles, prior to 1861, in which 25 feet at grade is fixed as the ground taken, for at the west end of the Goddard property where the road is at grade, and where we find stones set on opposite sides, the distance between is ascertained to be about 33 feet.

He seems to have accepted the fence at the west end as the boundary, as the stones there were set directly in its line; at the east end the stone was set some 2 feet 2 inches farther into the field.

Looking back over the facts of the case, we find in the original location and fencing, the change in the character of the fences by Morton, the relocation and setting of the stones by the company, and the resetting and change in the character of the fence by Mrs. Goddard, four distinct, unequivocal, and consistent acts, all pointing in the same direction and demonstrating that the land originally taken by the company did not extend beyond the line of these stones, to which at the east end, and

back of which at the west end, about 3 feet, Mrs. Goddard has set her wire and iron fences.

There is only one thing that militates against this view. At the commencement of the road, the president and engineer seem to have had an idea that at some future time, an additional track might be laid, and in 1853 they reported to the board that ground had been secured of sufficient width for a double-track road, 25 feet wide at grade, with the requisite side slopes at excavations and embankments. No doubt they so believed, and it may be possible that in some instance they could produce the evidence of what they said. Has this report any value as evidence?

Mr. Sickles, the engineer, says that he did not personally make any settlement of rights of way, and that his statement in the report, as to what had been secured in width in the making of such settlements, was based on what Mr. Rutter, the president, had told him.

Mr. Rutter is still living and within reach, but was not called before the master to show upon what ground he based his statements in the report.

Mr. Sickles' statement is wholly valueless, and the one made by Mr. Rutter was *ex parte,* was made after the act, was against the facts as they now appear; and being without proof of notice to Longstreth or his successors in title, it is of no binding effect upon anyone.

The map, which Mr. Sickles says he made after the location of the road, and the notes or memoranda which he made prior to 1861, when he walked over the road with an assistant engineer, are subject to the same objection as is made to his statement in the report.

The map, so far as this case is concerned, was necessarily made upon information obtained from Mr. Rutter; and the memoranda must have been made up from information coming from the same source. In neither case does it appear that he acted upon personal knowledge, or upon information obtained from original sources.

He simply put into form what he assumed had been done. As against the established facts of the case, none of these matters can have any weight, and the fact remains, as before found.

It follows, therefore, that the plaintiffs are entitled to the relief prayed for, and the master is of opinion: (1) That the

plaintiffs should have a decree restricting the Philadelphia &
Baltimore Central Railroad Company, and the Philadelphia,
Wilmington, & Baltimore Railroad Company, defendants, and
the agents, servants, and persons in their employ, from entering
on or occupying the said real estate or any part thereof, and from
depositing earth, stone, or other material thereon, outside or be-
yond the present inclosed limit of the roadbed of the said de-
fendants, and also from erecting and constructing or widening
said roadbed thereon until security be given or damages as-
sessed and secured as required by law; (2) that the said de-
fendants shall be decreed to pay the costs of this suit.

To this report exceptions were filed by the West Chester &
Philadelphia Railroad Company, defendant; but the court over-
ruled the exceptions, confirmed the report, and entered a decree
in accordance therewith; and this was the subject of the assign-
ments of error.

*John J. Pinkerton,* for appellants.—The authority of the
railroad company to occupy and use, for the purpose of a rail-
road, the land now owned by the appellees is derived from an act
of assembly, approved April 11, 1848 (P. L. 1850, p. 916, § 11)
and also from § 10 of the general railroad law of Pennsylvania,
approved February 19, 1849 (P. L. 1849, p. 79).

The appellant had the power under the first act to construct
a railroad with as many tracks as it might deem necessary, and,
under the other, to occupy land for that purpose, not exceeding
70 feet in width.

It seems to have been the intention of the railroad officers, at
the time of the location, to secure ground of sufficient width for
a double-track road.

In ascertaining the boundaries of the land taken by the com-
monwealth, if satisfactory monuments on the ground cannot
be found, regard must be had to the purpose for which the land
was to be used. Pennsylvania Canal Co. v. Harris, 101 Pa. 93.

In this case we are not left to conjecture as to what was orig-
inally done, nor are we left to rely upon presumptions of law
or fact.

The act of 1848 says that the president and managers "shall
survey, lay down, ascertain, mark, and fix such route as they
may deem expedient." The act of 1849 says the president and

directors shall have power by themselves, their engineers, etc., "to survey, ascertain, locate, fix, mark, and determine" such route for a railroad as they may deem expedient, etc.  In the steps taken by the president and managers of this company, and in the acts of Mr. Sickles, the engineer, these requirements have been fully and accurately complied with.

In Van Wyck v. Knevals, 106 U. S. 360, 27 L. ed. 201, 1 Sup. Ct. Rep. 336, the Supreme Court of the United States, affirming the court below, held that the route of the road was definitely fixed, within the meaning of the act, when the company filed with the Secretary of the Interior a map of its lines, approved by its directors, designating the route of the proposed road.

All acts, as regards fixing the route, must be performed by the officers of the company.  No notice to the landowner was needed.  The owner has no voice in the taking, except to demand that his property shall not be taken without payment or security, as required by the Constitution.  Harrisburg & P. R. Co. v. Peffer, 84 Pa. 296.

The release from Longstreth recites the act of assembly, giving authority to construct a double-track road, and shows that on August 13, 1853, $400 was paid as the amount agreed upon in release of damages, and this completed all the requisites of the Constitution and law, and gave the company the rights which it now insists are its.  The release operated not by way of an original conveyance, but by the way of discharge for the damages incurred by the entry and construction of the railway. Lawrence's Appeal, 78 Pa. 369; Dobbins v. Brown, 12 Pa. 75; Groh v. Eckert, 3 Brewst. (Pa.) 116.

It is unimportant, then, whether Mr. Sickles ever made any settlement of rights of way, for these can confer no title.

Public rights cannot be destroyed by long-continued encroachments,—at least, the party who claims the exercise of any right inconsistent with the free enjoyment of a public easement or privilege must put himself upon the ground of prescription, unless he has a grant, or some valid authority from the government.  Com. v. M'Donald, 16 Serg. & R. 401.

Permissive trespass, however long continued, never raises the presumption of a right as against an individual—much less as against a public body.  Susquehanna County v. Deans, 33 Pa. 133.

In Pennsylvania R. Co. v. Gray, No. 993, August term, 1875,

in the common pleas of Westmoreland county, a question was raised similar to the one in this cause, and the defendant propounded as his fourth point:

"Fourth. The plaintiff, under the paper of August 8, 1848, had a right to take possession of 66 feet for roadbed, but if the plaintiff took less and suffered the defendant to inclose and hold adversely by actual occupation any portion of the 66 feet, and hold adversely for the period of twenty-one years before this action brought, then the plaintiff cannot recover any part of the land so held."

This point Judge STERRETT refused.

*George E. Darlington* and *John G. Johnson,* for appellees.— The question raised by this appeal is not whether the railroad company can be prevented from taking ground deemed by it necessary for the enlargement of its business; but whether it can do this without paying for the damages it inflicts.

The report of the master as to the fact of original location must be sustained, because of appellants' failure to demonstrate error in his finding. Appellants have failed to show that there was ever any taking by them of the ground now claimed. Longstreth's covenant cannot be enforced against Mrs. Goddard.

In Pennsylvania R. Co. v. Gray, C. P. No. 993, August term, 1875, the defendant's covenant was enforced against him. It was held that he had agreed to give a way of a certain width, and that this was enforceable against him.

The statute of limitations not only would bar the road, if there had been merely location without an actual taking, but also if there had been such actual taking; it cannot be pleaded against the commonwealth, but it can be set up against quasi public corporations claiming land for public use. Pennsylvania Canal Co. v. Harris, 101 Pa. 94; Evans v. Erie County, 66 Pa. 224; Glover v. Wilson, 6 Pa. 290; Wood, Limitation of Actions, 92; Pella v. Scholte, 24 Iowa, 283, 95 Am. Dec. 729; Peoria v. Johnston, 56 Ill. 45; Cincinnati v. Evans, 5 Ohio St. 594; Richmond v. Poe, 24 Gratt. 149; Rowan v. Portland, 8 B. Mon. 232; Galveston v. Menard, 23 Tex. 408; Houston & T. C. R. Co. v. Travis Co. 62 Tex. 16; Wheeling v. Campbell, 12 W. Va. 36; Forsyth v. Wheeling, 19 W. Va. 318; Varick v. New York, 4 Johns. Ch. 53; Armstrong v. Dalton, 15 N. C. (4 Dev. L.) 568;

St. Charles Twp. v. Goerges, 50 Mo. 194; St. Charles County v. Powell, 22 Mo. 525, 66 Am. Dec. 637.

PER CURIAM:

The report of the learned master in this case is unexceptionable, and for the reasons which he has given we affirm the decree of the court below.

The decree is affirmed and the appeal dismissed, at the costs of appellants.